# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 18-3073-06-CR-S-BP |
| JERRY R. BLUE, | |
| Defendant. | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Timothy A. Garrison, United States Attorney, and Nhan D. Nguyen, Assistant United States Attorney, and the defendant, Jerry R. Blue ("the defendant"), represented by Brian David Risley.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count One of the Superseding Indictment, charging him with a violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B), that is, conspiracy to distribute 100 grams or more of a mixture or

substance containing a detectable amount of heroin. By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is, in fact, guilty of this offense.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which the defendant is pleading guilty are as follows:

Beginning on an unknown date, but at least as early as October 2, 2015, and continuing to on or about November 13, 2017, said dates being approximate, in Greene County, in the Western District of Missouri, and elsewhere, the defendants, Dangelo P. MOORE, James D. ELBERT, Rodriquez R. BRADLEY a.k.a. Rodriquez R. BRADLEY, Kevin D. PAINE, Kewan J. ROGERS, Jerry R. BLUE, Keilan A. MURRAY, Michael K. JOHNSON JR., and Presley A. PIKE, knowingly and intentionally conspired and agreed with each other and with others, known and unknown, to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(B).

*Overview of the Conspiracy*

Beginning on an unknown date, but at least as early as October 2, 2015, and continuing to on or about November 13, 2017, BLUE came to an agreement with one or more of the named co-defendants in the Superseding Indictment to distribute heroin in the Springfield, Missouri, area. BLUE admits that the quantity of heroin attributable to him is at least 100 grams.

*BLUE's Role in the Conspiracy*

*January 5, 2017, Search Warrant of BRADLEY's Residence*

On January 5, 2017, members of the Springfield, Missouri, Police Department (SPD) executed a State of Missouri search warrant at BRADLEY's residence, located on South Thelma Avenue, in Springfield, Missouri.

In the northwest bedroom, SPD Officer Eric Pinegar found:

1. in a black jacket pocket, 5.62 grams of heroin, a distributive amount;
2. on the bedroom floor, 1.88 grams of heroin; and
3. in the west closet, a utility bill with "Rodriguez Bradley" printed on it and in a jeans pocket, $18,910 in U.S. currency.

Before being transported to the Greene County, Missouri, Jail (GCJ), BRADLEY asked Officer Hartman for his boots. BRADLEY stated that his boots were in the northwest bedroom.

2

*BRADLEY's January 2017 Telephone Calls from the Greene County, Missouri, Jail*

BRADLEY made the following recorded telephone calls from the GCJ:

1. On January 6, 2017, in a call to a female (female 1), female 1 tells BRADLEY that he should not have surrounded himself with all of "those" people.

2. On January 6, 2017, in a call to another female (female 2), BRADLEY discusses with female 2 the fact that MOORE was at his residence every day and could be an informant. BRADLEY states that law enforcement took $30,000 in U.S. currency from his residence, but he still has money saved up from his "business."

3. On January 6, 2017, in a call to female 1, BRADLEY explains to her that he has seven "shirts" worth $3,000 apiece.[1] BRADLEY directs female 1 to only give BLUE a little at a time. BRADLEY reiterates that there are seven shirts, worth $3,000 a piece, totaling $21,000.

4. On January 7, 2017, in a call to female 1 and BLUE, BRADLEY stated that he was not going to be responsible for items seized in the middle bedroom. BLUE assured BRADLEY that the substance seized was Molly. BRADLEY directed BLUE to give the profits from the "shirts" to female 1. After a brief discussion on how many shirts were available, BRADLEY and BLUE agreed that there were only five.

5. On January 18, 2017, in a call between BRADLEY and BLUE, BRADLEY asked BLUE if he still had all of his "clothes?" BLUE responded that he had sold one of them. BRADLEY then directed BLUE to send him the proceeds.

6. On January 18, 2017, in a call to an unknown male, BRADLEY tells the male that if BLUE does not do what BRADLEY directed him to do, he will have female 1 get his "clothes" back.

7. On January 18, 2017, in a call to female 1, BRADLEY directs her to get his four "shirts" back from BLUE.

8. On January 18, 2017, in a call to female 1, female 1 tells BRADLEY that BLUE is refusing to give female 1 the "shirts" back. BRADLEY directs female 1 to call BLUE. Once BLUE is on the line, BLUE states that he is "hanging on to it" and then ended the call. When female 1 attempted to call BLUE back, there was no answer.

*May 25, 2017, Surveillance of MOORE*

On May 25, 2017, United States Drug Enforcement Administration (DEA) Task Force Officer (TFO) Benjamin Deutscher conducted surveillance of MOORE's residence, located on East Pythian Street, Springfield, Missouri. At 2:08 p.m., TFO Deutscher observed MOORE met

---

[1] "Shirts" is a street term meaning an ounce of heroin.

3

with BLUE and two other males in front of MOORE's Mercury Marauder. All four males then entered the breezeway that leads to MOORE's residence. At approximately 2:22 p.m., all four males exited the breezeway and walked towards MOORE's Mercury Marauder. MOORE entered his Mercury Marauder, and BLUE and two other males entered a Chrysler 300. Both vehicles traveled to MURRAY's residence, located on North Ramsey Street, in Springfield, Missouri, and walked inside. At 4:25 p.m., TFO Deutscher observed MOORE and MURRAY exit MURRAY's residence and walk to MOORE's Mercury Marauder. MOORE and MURRAY traveled back to MOORE's apartment.

### *August 11, 2017, Controlled Buy from BLUE*

On August 9, 2017, TFO Deutscher interviewed CI1 in reference to purchasing heroin from MOORE. CI1 stated that he/she contacted MOORE through MOORE's Facebook account, which has the name "Larry Lolife" and inquired about a purchase of heroin. MOORE instructed CI1 to contact a telephone number ending in 9270 to purchase the heroin. CI1 sent a text message to the telephone number to arrange the purchase of heroin for a future date. CI1 asked who he/she was talking to, and the person identified himself as "Larry" and a few minutes later responded "this his boy."

On August 11, 2017, TFO Deutscher utilized CI1 to arrange a controlled purchase of five grams of heroin for $750 from BLUE. TFO Deutscher directed CI1 to contact BLUE using the telephone number ending in 9270 to arrange the purchase. BLUE directed CI1 to meet at the Food 4 Less, located at 313 East Battlefield Road, in Springfield, Missouri.

Prior to the controlled purchase, agents established surveillance in the vicinity of the Food 4 Less.

The person of CI1 and his/her vehicle were searched, and no controlled substances were found. TFO Deutscher provided CI1 with $750 in U.S. currency. CI1 then drove to the Food 4 Less. Once CI1 arrived, he/she sent a text message to BLUE at the telephone number ending in 9270 to inform him of CI1's arrival. BLUE responded that he was already there.

As CI1 arrived, TFO Deutscher observed BLUE, driving a GMC Terrain, simultaneously arrive on the Food 4 Less parking lot and park several spaces north of the CI1's vehicle.

DEA Special Agent (SA) Tim Krisik observed the GMC Terrain back out of its original parking space and park next to CI1's vehicle. CI1 exited his/her vehicle and entered the front passenger seat of the GMC Terrain. CI1 exchanged $750 in U.S. currency for 4.90 grams of heroin. During the conversation between BLUE and CI1, TFO Deutscher heard BLUE ask CI1 why he/she was no longer dealing with "Larry," previously identified as MOORE. CI1 responded that "Larry" referred him/her to other people.

SA Krisik observed CI1 exit the GMC Terrain and return to his/her vehicle. CI1 then drove from the parking lot to a predetermined location. Upon arrival at the predetermined location, CI1 handed TFO Deutscher a plastic bag containing heroin. CI1 and CI1's vehicle were again searched, and no controlled substances were found.

DEA SA Mark Hooten followed the GMC Terrain as it traveled directly to BLUE's residence, located on East Lindberg Street, Springfield, Missouri. SA Hooten observed MOORE's Marauder parked in the driveway of that residence.

*August 22, 2017, Controlled Buy from BLUE*

On August 22, 2017, TFO Deutscher utilized CI1 to arrange another purchase of five grams of heroin for $750 from BLUE. TFO Deutscher directed CI1 to contact BLUE. BLUE directed CI1 to meet at the Hy-Vee, located at 1720 West Battlefield Road, in Springfield, Missouri.

Prior to the controlled purchase, agents established surveillance in the vicinity of BLUE's residence. After speaking with CI1, SA Hooten observed BLUE exit his residence and enter a Dodge Challenger.

Before traveling to the Hy-Vee, TFO Deutscher provided CI1 with $750 in U.S. currency and searched CI1 and his/her vehicle for controlled substances and U.S. currency. None were found. CI1 then received a text message from BLUE changing the buy location to the intersection of Sunshine Street and Kansas Expressway. CI1 responded that he/she would meet BLUE at the Pizza Hut restaurant, located at 1705 West Sunshine Street, in Springfield, Missouri, which was nearby.

CI1 traveled directly to the Pizza Hut, followed by TFO Deutscher. When CI1 arrived, he/she sent a text message to BLUE stating "I'm here bro." Shortly thereafter, BLUE arrived in the Dodge Challenger and parked next to CI1's vehicle, with both driver's side windows situated next to each other. CI1 then exchanged $750 in U.S. currency for 4.609 grams of heroin.

CI1 then traveled directly back to a pre-determined location and gave the heroin to TFO Deutscher.

SA Hooten followed BLUE back to his residence. Approximately 20 minutes later, while monitoring a tracking device placed on MOORE's Mercury Marauder, TFO Deutscher observed that the Mercury Marauder arrived at BLUE's residence.

*September 28, 2017, Controlled Buy from BLUE*

On September 28, 2017, TFO Deutscher conducted another controlled buy of heroin utilizing CI1. Before the buy, TFO Deutscher searched CI1's person and vehicle with negative results for U.S. currency or controlled substances. TFO Deutscher then handed CI1 $750 in U.S. currency to purchase five grams of heroin from BLUE. CI1 called BLUE. CI1 and BLUE agreed to meet at the Rapid Roberts, located at 1655 South Kansas Expressway, in Springfield, Missouri.

Upon CI1's arrival at the Rapid Roberts, TFO Deutscher observed that BLUE's GMC Terrain was already there. CI1 received a telephone call from BLUE instructing CI1 to come to the north side of the building. CI1 complied and parked next to the GMC Terrain on the north of

5

the building. BLUE exited the passenger side of the GMC Terrain and entered CI1's vehicle. BLUE then exchanged 4.50 grams of heroin for $750. BLUE exited CI1's vehicle and returned to the passenger side of the GMC Terrain.

*October 5, 2017, Controlled Buy from BLUE*

On October 5, 2017, TFO Deutscher conducted a controlled buy of heroin utilizing CI1 from BLUE. Before the buy, TFO Deutscher searched CI1's person and vehicle with negative results for U.S. currency or controlled substances. TFO Deutscher then handed CI1 $750 in U.S. currency to purchase the five grams of heroin.

Surveillance was established at BLUE's residence on West Olive Street, in anticipation that BLUE would leave the residence in his GMC Terrain. CI1 contacted BLUE. BLUE instructed CI1 to meet him at Food 4 Less, located at 313 East Battlefield Road, in Springfield, Missouri.

DEA TFO Dan Banasik observed BLUE leave the residence on West Olive Street and enter the GMC Terrain.

CI1 traveled to the Food 4 Less. When CI1 arrived, he/she received a telephone call from BLUE changing the buy location to the Wal-Mart, located at 444 West Grand Street, in Springfield, Missouri. TFO Banasik followed the GMC Terrain to the Wal-Mart where it parked.

When CI1 arrived at the Wal-Mart, he/she parked next to the GMC Terrain, exited his/her vehicle, and entered the GMC Terrain. While in the GMC Terrain, CI1 exchanged with BLUE approximately 4.90 grams of heroin for $750. After the buy, CI1 exited the GMC Terrain, returned to a pre-determined location, and handed the heroin to TFO Deutscher.

*November 13, 2017, Controlled Buy from MURRAY and BLUE*

On November 13, 2017, TFO Deutscher directed another confidential informant (CI2) to call MURRAY to arrange a purchase of one gram of heroin for $180 in U.S. currency.

Before the controlled buy, DEA TFO Jeff Saylor established surveillance at MURRAY's residence on North Park Avenue, in Springfield, Missouri.

In a recorded conversation, MURRAY directed CI2 to meet him at the Dairy Queen, located at 2300 West College Street, in Springfield, Missouri.

Before the controlled buy, SPD Officer Kathy Dunnigan searched CI2's person for controlled substances and U.S. currency, and none were found. TFO Deutscher then handed CI2 $200 in U.S. currency to purchase the heroin.

TFO Deutscher and SA Krisik transported CI2 to the Dairy Queen. Upon arrival, CI2 called MURRAY to inform him of CI2's arrival, but received no answer. Approximately five

minutes later, MURRAY inquired if CI2 had arrived and stated that he was on his way. Approximately two minutes later, BLUE, in his GMC Terrain, entered the parking lot of the Dairy Queen. CI2 entered the GMC Terrain and exchanged $180 in U.S. currency for .533 gram of heroin from BLUE.

CI2 then returned to TFO Deutscher's vehicle and a handed TFO Deutscher the heroin and $20 in U.S. currency. All parties traveled to a predetermined location. Upon arrival at the predetermined location, SPD Officer Melissa Adams searched CI2 for controlled substances and U.S. currency, and none were found.

In an interview with CI2, CI2 confirmed that it was BLUE that sold CI2 the heroin.

4. **Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the Superseding Indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charge to which he is pleading guilty.

5. **Statutory Penalties.** The defendant understands that, upon his plea of guilty to Count One of the Superseding Indictment, charging him with conspiracy to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, the minimum penalty the Court may impose is not less than five years' imprisonment, while the maximum penalty the Court may impose is not more than 40 years' imprisonment, not less than four years' supervised release, a $5 million fine, and a $100 mandatory special assessment per felony count of conviction, which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class B felony.

7

6. **Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

   a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

   b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

   c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release of at least four years;

   d. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

   e. any sentence of imprisonment imposed by the Court will not allow for parole;

   f. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

   g. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

7. **Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the conspiracy to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin for which it has venue and which arose out of the defendant's conduct described above. Additionally, the United States Attorney for the Western District of Missouri agrees to dismiss Counts 15, 16, 18, 19, and 22, as they pertain to the defendant at sentencing.

8

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that, if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8. **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve

9

the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that, if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

    a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

    b. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2D1.1, which provides for a base offense level of at *least* 30;

    c. The parties have no agreement regarding the applicability of any enhancements or reductions applicable to the specific facts of this case and are free to argue for, or object to, the application of any enhancements or reductions applied in the presentence report;

    d. The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for

10

trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a 3-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant: (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

    e. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

    f. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

    g. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the Superseding Indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay; and

    h. The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed upon Guidelines calculations contained in this agreement.

11. **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

11

12. **Change in Guidelines Prior to Sentencing.** The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

13. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

    a. oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

    b. comment on the evidence supporting the charge in the Superseding Indictment;

    c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentence imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

    d. oppose any post-conviction motions for reduction of sentence, or other relief.

14. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

    a. the right to plead not guilty and to persist in a plea of not guilty;

    b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

    c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

      d.      the right to confront and cross-examine the witnesses who testify against him;

      e.      the right to compel or subpoena witnesses to appear on his behalf; and

      f.      the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offense to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands that he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

15. **Waiver of Appellate and Post-Conviction Rights.**

      a.      The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

      b.      The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

   a. The Court may order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the Superseding Indictment which are to be dismissed and all other uncharged, related criminal activity;

   b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine;

   c. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full;

   d. Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit: (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility;

   e. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution;

   f. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence;

   g. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing;

14

h. The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future; and

i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered plea of guilty shall remain in effect and cannot be withdrawn.

17. **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

18. **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

19. **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally

15

misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

20. **Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his plea of guilty.

21. **No Undisclosed Terms.** The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any

written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

22. **Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any

drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

Dated: 11/7/2019

By

**Timothy A. Garrison**
United States Attorney

**NHAN D. NGUYEN**
Assistant United States Attorney
Missouri Bar No. 56877

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the Superseding Indictment. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 11/7/2019

**Jerry R. Blue**
Defendant

I am Defendant Jerry R. Blue's attorney. I have fully explained to him his rights with respect to the offense charged in the Superseding Indictment. Further, I have reviewed with him the provisions of the Sentencing Guidelines that might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Jerry R. Blue's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 11/7/2019

**Brian David Risley**
Attorney for Defendant